IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

BRADLEY A. BENTZEN, )
)
Plaintiff, )
)
v. ) Civil Action No. 09-1006-GMS
)
MICHAEL J. ASTRUE,[1] )
Commissioner of Social Security, )
)
Defendant. )

## MEMORANDUM

## I.    INTRODUCTION

This action arises from the denial of plaintiff Bradley Bentzen's ("plaintiff") claim

for Social Security benefits.  On December 18, 2006, plaintiff filed applications for

Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under

Titles II and XVIII of the Social Security Act (the "Act").  (D.I. 6 at 103-117)  In his

application and disability report, plaintiff claimed he became disabled beginning on

June 5, 2006, due to lower back and bilateral leg pain.  (Id. at 140-41.)  Following the

Social Security Administration's ("SSA") denial of his claim, both initially and upon

reconsideration, plaintiff requested an ALJ hearing.  (Id. at 64, 69-71, 76-79.)  The

hearing occurred on February 4, 2009. (Id. at 24, 26.)  At the hearing, testimony was

provided by plaintiff and an impartial vocational expert ("VE"), Tony Melanson

---

[1] Carolyn W. Colvin became the Commissioner of Social Security
("Commissioner") on February 13, 2013, after briefing began.  Although under Federal
Rule of Civil Procedure 25, Carolyn W. Colvin should be substituted for Michael J.
Astrue, pursuant to 42 U.S.C § 405(g), no further action is necessary to continue this
action.

("Melanson"). (*Id.* at 26-59) On April 29, 2009, the ALJ, Melvin D. Benitz, issued a written decision denying plaintiff's benefits claim. (*Id.* at 8-23.) Plaintiff requested a review of the ALJ's decision by the Social Security Appeals Council, which denied review on December 2, 2009. (*Id.* at 1-7.) On December 30, 2009, plaintiff filed a timely appeal with the court. (D.I. 1.) Presently before the court are the parties' cross-motions for summary judgment. (D.I. 9, 14.) For the reasons that follow, the court will grant plaintiff's motion for summary judgment, and deny defendant's motion for summary judgment.

## II.    BACKGROUND

Plaintiff was born on February 1, 1975. (D.I. 6 at 110.) He has a high school diploma and attended some college. (*Id.* at 28-29.) His alleged disability dates back to. June 5, 2006. (*Id.* at 34.) Plaintiff's underlying injury occurred in 1998, when he was accidentally struck by a heavy drum while working as a chemical operator. (*Id.* at 29-33.) Plaintiff continued to work as a chemical operator until he was terminated on June · 5. 2006. (*Id.* at 34.) Plaintiff, however, stopped physically working in 2005, and collected long-term disability benefits until his termination in 2006. (*Id.* at 34-35.) Plaintiff has not worked since his termination as a chemical operator. (*Id.* at 118-23.) Despite his prior vocational experience, plaintiff claims he remains disabled under the Act. (*Id.* at 35-55.) To be eligible for DIB and SSI, plaintiff must demonstrate he is disabled within the meaning of sections 216(I), 223(d), and 1614(a)(3)(A) of the Social Security Act. (*Id.* at 11.)

2

## A.    Evidence Presented

Plaintiff suffered a work-related lumbar strain back injury on October 8, 1998. (*Id.* at 469, 726.) Plaintiff suffered further lumbar strain back injuries in 2001 and in September 2003. (*Id.* at 469.) Until December 2003, plaintiff was treated conservatively for back pain resulting from the injuries, with treatment consisting of physical therapy and medications. (*Id.* at 188.) His back pain failed to lessen after this conservative treatment, and he experienced a high level of limitations and impairment of activities of daily living. (*Id.* at 190, 192.) On December 9, 2003, plaintiff was admitted to Christiana Care for an experimental total disk replacement, after being diagnosed with degenerative disk disease with internal disk disruption and positive diskogenic pain at the L5-S1 segment. (*Id.* at 188, 190, 192, 605.) He tolerated the procedure well. (*Id.* at 188, 190, 193.)

Plaintiff continued to work as a chemical synthesis technician until June 5, 2006. (*Id.* at 141.) On June 14, 2006, he underwent a lumbar discography, which revealed a degenerative L4/5 disc with posterior annular tear, herniated nucleus propulsus, and concordant back pain. (*Id.* at 214.) This procedure was performed by Dr. Frank Falco ("Dr. Falco") of Mid Atlantic Spine, who was plaintiff's physician from June 2006 until April 2009. (*Id.* at 214, 607-706.) The tear was described as a "thru and thru tear." (*Id.* at 701.) The result of an electrodiagnostic report on June 19, 2006 showed an abnormal condition. (*Id.* at 693-94.) However, multiple examinations in 2006 and 2007 found plaintiff to have normal reflexes, muscle strength, alertness, motor functions, and coordination. (*Id.* at 210, 239, 469, 611-21, 624-37, 642-43, 648-49, 722.)

3

On January 2, 2007, plaintiff underwent a CT scan performed by Dr. Falco, which revealed an L4/5 disc protrusion with subsequent stenosis and nerve root compression. (*Id.* at 561.) The CT scan showed no central canal stenosis or degenerative disc changes. (*Id.*) On January 8, an EMG performed by Dr. Falco showed abnormal right L5 motor radiculopathy and left L5 and S1 motor radiculopathy. (*Id.* at 656.) Another EMG performed by Dr. Falco on August 22, 2007, showed abnormal bilateral L5/S1 motor radiculopathy. (*Id.* at 608.)

Plaintiff sought many treatments for pain, which he described as severe. (*Id.* at 332.) These treatments included intradiscal electrothermic therapy sessions by Dr. Falco in August and September 2006, selective nerve root block treatments from Dr. Falco in March and April 2006 and January and February 2007, and a seven-day spinal cord stimulation[2] trial by Dr. Falco in June 2007. (*Id.* at 495-96, 498, 548, 550, 554, 575, 616, 622-23, 672, 683.) Plaintiff was prescribed multiple medications for his pain, including morphine, Oxycodone, Valium, Depakote, Dilaudid, MS Contin, and Percocet. (*Id.* at 242, 252-53, 368, 737.) Plaintiff also visited the emergency room at Christiana Care on three occasions in 2006 due to back pain. (*Id.* at 223, 235, 510.)

Beginning in May 2006, plaintiff's physicians advised he could not work. (*Id.* at 340.) Similar reports continued through August 2007. (*Id.* at 611-12.) In November 2007, Dr. Falco prepared a Residual Functional Capacity ("RFC") evaluation. (*Id.* at 717-720.) This RFC evaluation limited plaintiff's lifting to nothing heavier than a can of

---

[2] While plaintiff claimed to use the spinal cord stimulator the majority of the day, every day, Dr. Falco's programmer noted plaintiff only used the stimulator for one hour during the first four days of the seven-day trial. (*Id.* at 616.) Plaintiff only used the stimulator for a total of 75 hours during the entire seven-day trial. (*Id.*)

4

soda. (*Id.* at 717.) It also restricted sitting or standing to ten minutes at a time, nor for more than two hours in an eight-hour workday, and required plaintiff to lie down twice an hour for fifteen to twenty minutes. (*Id.*) The RFC noted plaintiff's medications had a moderate effect on his ability to concentrate, and pain would interfere with his ability to complete an eight-hour workday. (*Id.* at 717-18.) The RFC advised no exposure to extreme temperature changes, unprotected heights, vibration, fumes, or moving machinery. (*Id.* at 718.) Finally, the RFC found plaintiff could not perform sedentary work,[3] even on a part-time basis.[4] (*Id.* at 719.) In February 2009, Dr. Falco prepared another RFC evaluation that reached the same conclusions. (*Id.* at 737-40.) This RFC evaluation repeated plaintiff was incapable of doing "low stress" jobs because of severe pain. (*Id.* at 738.)

In January 2007, plaintiff was examined by Dr. David Stephens, who concluded he could perform sedentary work. (*Id.* at 468-71.) Dr. Stephens noted plaintiff limped during the examination, which disappeared when he was leaving the office. (*Id.* at 469.) Dr. Stephens observed plaintiff moved more freely than he claimed. (*Id.*) Upon reexamination in August 2007, however, Dr. Stephens found plaintiff could not work at all. (*Id.* at 723.) His change of opinion rested on the failure of the spinal cord stimulation to reduce pain and significant loss in range of motion. (*Id.* at 469, 722-23.)

---

[3] Sedentary work is defined as work involving lifting no more than ten pounds at a time, but with occasional lifting or carrying of light items. It includes sitting, but also may require some walking and standing. Thus, jobs may be considered sedentary if occasional walking and standing is required. (20 C.F.R. § 404.1567(a).) For sedentary work, no more than a total of two hours of standing during an eight-hour workday is allowed. (SSR 83-10 at *5.)

[4] "Part-time" is defined as less than forty hours per week. (D.I. 6 at 719.)

5

Finally, a Physical Residual Functional Capacity Assessment prepared by Dr. Sheldon Stein ("Dr. Stein") on June 4, 2007, determined plaintiff could perform light duty work.[5]   (*Id.* at 600-06.)   Dr. Stein never examined plaintiff, and based his assessment on the medical records. (*Id.*)   Dr. Stein acknowledged plaintiff suffered from significant pain,[6] which was constant and not relieved by pain medication. (*Id.* at 605).

Dr. Stein, however, noted the absence of any abnormal findings on the emergency room records from plaintiff's three emergency room visits for back pain in 2006. (*Id.*)   He further noted normal findings on several occasions in the medical record, apart from a finding of L4/5 disc protrusion with subsequent stenosis and nerve root compression. (*Id.* at 561, 606.)   Dr. Stein concluded plaintiff was exaggerating his

---

[5] Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job falls in this category when it requires a considerable walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, a claimant must have the ability to do substantially all these activities. If a claimant can perform light work, then he or she is able to do sedentary work, unless there are additional limiting factors, such as loss of fine dexterity or inability to sit for long periods of time. (20 C.F.R. § 404.1567(b).)   Thus, light work is more physically demanding than sedentary work. (20 C.F.R. § 404.1567.)   Sedentary work is the least physically demanding type of work. (*Id.*)

[6] Plaintiff's pain while taking pain medication was described as six out of ten. (D.I. 6 at 605.)   Pain is measured on a scale of zero to ten, where zero is no pain and ten is pain so severe that hospitalization is required for management. (*Id.* at 349.)   Six out of ten corresponds to pain severe enough to warrant use of a mild narcotic, such as codeine, for treatment. (*Id.*)

6

symptoms, displayed narcotic-seeking behavior,[7] and found his complaints were only partially credible. (Id. at 606.)

In the February 2009 RFC evaluation by Dr. Falco, he refuted Dr. Stein's findings and determined plaintiff was unable to perform any work. (Id. at 727, 738.) The RFC reported pain was eight out of ten,[8] and the prognosis was poor. (Id. at 737.) Dr. Falco concluded plaintiff was not a malingerer, and pain would constantly[9] interfere with his ability to perform even simple work tasks. (Id. at 737-38.) The RFC evaluation restricted plaintiff from lifting or carrying anything, and from twisting, stooping, bending, crouching, squatting, or climbing ladders. (Id. at 739-40.) Plaintiff could occasionally climb stairs, and had no significant limitations on reaching, handling, or fingering. (Id. at 740.) The RFC reported plaintiff would, on average, be absent from work more than four days per month because of pain. (Id.)

Despite his injury, plaintiff was able to engage in some limited personal activities. In a March 2007 Function Report, plaintiff stated he read, watched television, did simple cooking,[10] dishwashing, dusting, small loads of laundry, and limited driving, walked

---

[7] Plaintiff stated he has a written contract with Dr. Falco requiring he only obtain pain medication from Dr. Falco except in an emergency. Violation of this agreement would result in discharge from Dr. Falco's practice. (Id. at 37.) As a result of his second examination of plaintiff in August 2007, Dr. Stephens reported plaintiff had an opioid dependency. (Id. at 722.)

[8] Eight out of ten corresponds to pain severe enough to warrant an emergency room visit and strong narcotics for treatment. (Id. at 349.)

[9] "Constantly" is defined to mean more than two-thirds of the workday. (Id. at 738.)

[10] Plaintiff explained he only cooks frozen dinners in the microwave and makes sandwiches, because cooking multi-course meals requires standing for too long. (Id. at 150, 605.)

7

short distances,[11] made small grocery purchases,[12] and occasionally attended church.[13] (*Id.* at 148-53.) All these activities are limited by plaintiff's pain. (*Id.*) Plaintiff claimed he rarely socialized due to pain. (*Id.* at 153.)

## B.    Hearing Testimony

### 1.    Plaintiff's Testimony

At the February 4, 2009 hearing, plaintiff testified about his background, injury, pain, and treatments. (*Id.* at 26-55.) He stated his past jobs were a chemical operator, a restaurant manager, and a cook at multiple restaurants. (*Id.* at 29.) His initial back injury occurred in 1998 while working as a chemical operator, when a 1600-pound drum struck him. (*Id.* at 30-33.) After the accident, plaintiff continued to work as a chemical operator until June 5, 2006,[14] when he was terminated by his employer. (*Id.* at 33-34.) Plaintiff's salary at the time of termination was about $65,000 annually. (*Id.* at 47.) At the time of the hearing, plaintiff was receiving workers' compensation benefits of $542 per week, which was his only source of income. (*Id.* at 30-31, 52.) Previously, he received a lump sum payment of $34,000 for permanency and disfigurement. (*Id.* at 31-32.)

Plaintiff stated his job as a chemical operator involved frequent lifting of moderate weights, requiring him to repeatedly lift thirty pounds 200 times in an hour.

---

[11] Plaintiff represented he can only walk a quarter of a block, and requires roughly fifteen minutes breaks between walks. (*Id.* at 153.) By February 2009, plaintiff could not walk without severe pain, although he testified he could possibly walk up to half a block. (*Id.* at 52, 738.)

[12] Plaintiff said he only shops once a month for short time periods. (*Id.* at 151.)

[13] Plaintiff explained he only attends church if not in pain.

[14] Plaintiff actually stopped work in 2005 due to back pain. From then until his termination, he collected long-term disability benefits from his employer. (*Id.* at 34-35.)

8

(*Id.* at 35.) In 2005, back pain eliminated such lifting, and his doctor recommended to stop working. (*Id.*) As a result, plaintiff claimed he could not perform a light duty job, such as answering phones, and could only sit or stand for fifteen minutes at a time due to pain. (*Id.* at 35-36.)

Plaintiff described the medical treatment for his pain. (*Id.* at 36-44.) After undergoing disc replacement surgery in 2003, his pain briefly subsided for about eight months. (*Id.* at 39.) His surgeon referred him to Dr. Falco for pain management, whom he exclusively sees for this condition. (*Id.* at 39-40.) At the time of the hearing, plaintiff was taking MS Contin, Lyrica, and Dilaudid for pain. (*Id.* at 41.) He was also prescribed Amrix, a muscle relaxant, to be taken as needed. (*Id.*) Dr. Falco requires all patients, including plaintiff, to undergo monthly drug screening urine tests. (*Id.* at 37-38.)

Plaintiff underwent both a trial morphine pump and a trial spinal cord stimulator. (*Id.* at 36-37.) The morphine pump provided some pain relief, while the spinal cord stimulator made his pain worse. (*Id.*) At the time of the hearing, plaintiff was scheduled to receive a permanent morphine pump, which may enable him to reenter the workforce in the future. (*Id.* at 36, 47-48.) Plaintiff testified physical therapy provided no benefit, and only exacerbated his pain. (*Id.* at 50-51.)

Pain interferes with sleep and dressing. (*Id.* at 42-45.) Plaintiff stated although he can perform some simple household tasks, they are severely limited in scope and duration due to pain. (*Id.* at 45-46.) Driving or riding in a car is limited to doctors' appointments or for short distances. (*Id.* at 46-48, 54-55.) Pain interferes with enjoying

9

or playing with his son. (Id. at 48-49.) He is required to lie down for five hours during an eight-hour period, and if he does not, the pain becomes so severe that he requires emergency room treatment.[15] (Id. at 49-50, 53-54.) Finally, plaintiff claims he gained about 100 pounds after his injury, since he cannot exercise. (Id. at 51-52.)

## 2. The Vocational Expert's Testimony

Melanson testified about plaintiff's background, skills, and limitations, and the number of jobs available in the national economy that a person of plaintiff's age, education, and skills may perform. (Id. at 55-59.) Plaintiff's past relevant work history was as a chemical operator at heavy exertional levels,[16] a restaurant manager at medium exertional levels, and a cook at medium exertional levels. (Id. at 55.)

Melanson opined plaintiff could transfer skills from his previous restaurant manager job to a similar position at light exertional levels. (Id. at 56.) His other prior employment would not involve the transferring of skills. (Id.)

The ALJ posed the following hypothetical situation: the individual had the same age, educational background, and past relevant work history, as well as all of plaintiff's symptoms and limitations. (Id.) In response, the VE testified that individual could

---

[15] Often, a member of Dr. Falco's staff would be called to the emergency room. (Id. at 53-54.) Some of plaintiff's emergency room visits resulted in hospitalization. (Id. at 54.)

[16] Typically, chemical operators perform at medium exertional levels. Because of the frequency and weight plaintiff had to lift, the VE classified his position as a chemical operator at heavy exertional levels. (Id. at 55, 57-58.) Exertion refers to the primary strength activities of sitting, standing, walking, lifting, carrying, pushing, and pulling. SSR 83-10, at *5.

perform the jobs of security monitor,[17] addresser/clerical sorter,[18] or information clerk.[19]

(*Id.* at 56-57.) All of these jobs would permit the individual to sit and stand[20] as is

required. (*Id.* at 57.) However, the VE testified the individual could no longer perform

any of his past work due to his limitations. (*Id.*)

## C. The ALJ's Findings

Based on the medical evidence and testimony of plaintiff and the VE, the ALJ

determined plaintiff was not disabled and, therefore, ineligible for DIB or SSI. (*Id.* at 8-

23.) The ALJ's findings are summarized as follows:

1.  The claimant meets the insured status requirements
    of the Social Security Act through March 31, 2012.

2.  The claimant has not engaged in substantial gainful
    activity since June 5, 2006, the alleged onset date (20
    C.F.R. 404.1571 *et seq.* and 416.971 *et seq.*).

3.  The claimant has the following severe impairment:
    degenerative disc disease of the lumbar spine with
    associated radiculopathy (20 C.F.R. 404.1520© and
    416.920©).

4.  The claimant does not have an impairment or
    combination of impairments that meets or medically
    equals one of the listed impairments in 20 C.F.R. Part
    404, Subpart P, Appendix 1 (20 C.F.R. 404.1525,
    404.1526, 416.925, and 416.926).

---

[17] The security monitor is sedentary and unskilled work, and 500 of these jobs
exist regionally, with 120,000 available nationally. (D.I. 6 at 57)

[18] About 380 of these jobs are available regionally and 70,000 nationally. (*Id.* at
57.)

[19] Roughly 350 of these jobs exist regionally and 65,000 nationally. (*Id.* at 57.)

[20] The official descriptions of these jobs do not address the issue of sitting and
standing. However, the VE testified, in his experience, such jobs would be compatible
with relevant sitting and standing requirements. (*Id.* at 57.)

11

5.     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. 404.1567(a) and 416.967(a) except for work which requires lifting more than 10 pounds occasionally or lesser amounts frequently, standing for periods of more than 15-20 minutes consistently on an alternate basis during an 8-hour day, 5 days per week, any climbing of stairs, scaffolds, or such devices, any exposure to heights and hazardous machinery, or any exposure to temperature and humidity extremes or vibration. In addition, the claimant is further limited to no more than simple, routine, unskilled tasks not involving more than a low level of stress, concentration, or memory secondary to pain.

6.     The claimant is unable to perform any past relevant work (20 C.F.R. 404.1565 and 416.965).

7.     The claimant was born on February 1, 1975, and was 31 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 C.F.R. 404.1563 and 416.963).

8.     The claimant has at least a high school education and is able to communicate in English (20 C.F.R. 404.1564 and 416.964).

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. 404.1569, 404.1569a, 416.969, and 416.969a).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from June 5, 2006

12

> through the date of this decision (20 C.F.R.
> 404.1520(g) and 416.920(g)).

## III.   STANDARD OF REVIEW

### A.   Motion For Summary Judgment

Both parties filed motions for summary judgment pursuant to Federal Rule of

Civil Procedure 56©.  In determining the appropriateness of summary judgment, the

court must "review the record as a whole, 'draw[ing] all reasonable inferences in favor

of the non-moving party[,]' but [refraining from] weighing the evidence or making

credibility determinations." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133,

150 (2000) (citation omitted).  If there is no genuine issue as to any material fact and

the movant is entitled to judgment as a matter of law, summary judgment is appropriate.

*See Hill v. City of Scranton*, 411 F.3d 118, 125 (3d Cir. 2005) (quoting FED. R. CIV. P.

56©).

This standard does not change merely because there are cross-motions for

summary judgment. *Appelmans v. City of Philadelphia*, 826 F.2d 214, 216 (3d Cir.

1987).  Cross-motions for summary judgment:

> are no more than a claim by each side that it alone is entitled to summary
> judgment, and the making of such inherently contradictory claims does not
> constitute an agreement that if one is rejected the other is necessarily
> justified or that the losing party waives judicial consideration and
> determination whether genuine issues of material fact exist.

*Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir. 1968).  "The filing of cross-

motions for summary judgment does not require the court to grant summary judgment

for either party." *Krupa v. New Castle County.*, 732 F. Supp. 497, 505 (D. Del. 1990).

## B.    Review of the ALJ's Findings

Section 405(g) sets forth the standard of review of the ALJ's decision by the district court. The court may reverse the Commissioner's final determination only if the ALJ did not apply the proper legal standards, or the record did not include substantial evidence to support the ALJ's decision. The Commissioner's factual decisions are upheld if supported by substantial evidence. *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *see also Monsour Med. Ctr. v. Heckle*, 806 F .2d 1185, 1190 (3d Cir. 1986). Substantial evidence means less than a preponderance, but more than a mere scintilla of evidence. *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005). As the United States Supreme Court has found, substantial evidence "does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

In determining whether substantial evidence supports the Commissioner's findings, the court may not undertake a *de novo* review of the Commissioner's decision nor re-weigh the evidence of record. *Monsour*, 806 F.2d at 1190. The court's review is limited to the evidence that was actually presented to the ALJ. *Matthews v. Apfel*, 239 F.3d 589, 593-95 (3d Cir. 2001). The Third Circuit has explained that a "single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence, particularly certain types of evidence (e.g., evidence offered by treating physicians) or if it really constitutes not evidence but mere

14

conclusion." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983). Thus, the inquiry is
not whether the court would have made the same determination, but rather, whether
the Commissioner's conclusion was reasonable. *Brown v. Bowen*, 845 F.2d 1211,
1213 (3d Cir. 1988). Even if the court would have decided the case differently, it must
defer to the ALJ and affirm the Commissioner's decision so long as that decision is
supported by substantial evidence. *Monsour*, 806 F.2d at 1190-91.

In an action in which review of an administrative determination is sought, the
agency's decision cannot be affirmed on a ground other than that actually relied upon
by the agency in making its decision. *Hansford v. Astrue*, 805 F. Supp. 2d 140, 144-45
(W.D. Pa. 2011). In *Sec. & Exch. Comm'n v. Chenery Corp.*, the United States
Supreme Court found that a "reviewing court, in dealing with a determination or
judgment which an administrative agency alone is authorized to make, must judge the
propriety of such action solely by the grounds invoked by the agency. 332 U.S. 194,
196 (1947). If those grounds are inadequate or improper, the court is powerless to
affirm the administrative action by substituting what it considers to be a more adequate
or proper basis." *(Id.)* The Third Circuit has recognized the applicability of this finding
in the social security disability context. *Fargnoli v. Massanari*, 247 F.3d 34, 44, n.7 (3d
Cir. 2001). This court's review is limited to the four corners of the ALJ's decision.
*Cefalu v. Barnhart*, 387 F. Supp. 2d 486, 491 (W.D. Pa. 2005). In social security cases,
the substantial evidence standard applies to motions for summary judgment brought
pursuant to FED. R. CIV. P. 56©. *See Woody v. Sec'y. of the Dep't. of Health & Human
Serv.*, 859 F.2d 1156, 1159 (3d Cir. 1988).

15

## IV.   DISCUSSION

### A.   Parties' Contentions

In his appeal, plaintiff contends the ALJ did not have substantial evidence to support the denial of his application for DIB and SSI, arguing the ALJ improperly substituted his judgment for that of the treating medical source opinions of record, and erred in the amount of controlling weight given to the assessments of Drs. Falco and Stephens.  (D.I. 10, 17.)  Plaintiff also argues the ALJ's finding that he must alternate between sitting and standing is incompatible with the ability to perform sedentary work. (Id.)  The Commissioner maintains the ALJ properly included all medical opinion evidence of record, and controlling weight to the assessments of Drs. Falco and Stephens was not required.  (D.I. 15)  The Commissioner also contends the ALJ properly found plaintiff could perform certain types of sedentary work, and seeks a finding that the ALJ's decision was supported by substantial evidence.  (Id.)

### B.   Disability Analysis

Title II of the Social Security Act, 42 U.S.C. § 423(a)(l)(D), "provides for the payment of insurance benefits to persons who have contributed to the program and who suffer from a physical or mental disability." Bowen, 482 U.S. at 140.  In order to qualify for DIB, the claimant must establish he was disabled prior to the date he was last insured. See 20 C.F.R. § 404.131.  A "disability" is defined as the inability to do any substantial gainful activity because of any medically determinable physical or mental impairment, which either could result in death or has lasted or can be expected to last for a continuous period of at least 12 months.  42 U.S.C. §§ 423(d)(l)(A),

1382(c)(a)(3). To be disabled, the severity of the impairment must prevent return to previous work, and based on age, education, and work experience, restrict "any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A); *Barnhart v. Thomas,* 540 U.S. 20, 21-22 (2003).

In determining whether a person is disabled, the Commissioner is required to perform a five-step sequential analysis. 20 C.F.R. § 404.1520; *see also Plummer v. Apfel,* 186 F.3d 422,427-28 (3d Cir. 1999). If a finding of disability or non-disability can be made at any point in the sequential process, the review ends. 20 C.F.R. § 404.1520(a)(4). At the first step, the Commissioner must determine whether the claimant is engaged in any substantial gainful activity, and if so, a finding of non-disabled is required. 20 C.F.R. § 404.1520(a)(4)(I). If the claimant is not so engaged, step two requires the Commissioner to determine whether the claimant is suffering from an impairment or a combination of impairments that is severe. If no severe impairment or a combination thereof exists, a finding of non-disabled is required. 20 C.F.R. § 404.1520(a)(4)(ii).

If the claimant's impairments are severe, the Commissioner, at step three, compares them to a list of impairments (the "listings") that are presumed severe enough to preclude any gainful work. 20 C.F.R. § 404.1520(a)(4)(iii); *see also Plummer,* 186 F.3d at 428. When a claimant's impairment or its equivalent matches an impairment in the listing, the claimant is presumed disabled. 20 C.F.R. § 404.1520(a)(4)(iii). If a claimant's impairment, either singularly or in combination, fails to meet or medically equal any listing, the analysis continues to steps four and five. 20 C.F.R. § 404.1520(e). At step four, the Commissioner determines whether the claimant

17

retains the RFC to perform his past relevant work.  20 C.F.R. § 404.1520(a)(4)(iv); *Plummer*, 186 F.3d at 428.  A claimant's RFC is "that which an individual is still able to do despite the limitations caused by [his] impairment(s)."  *Fargnoli*, 247 F.3d at 40. "The claimant bears the burden of demonstrating an inability to return to [his] past relevant work."  *Plummer*, 186 F.3d at 428.

If the claimant is unable to return to his past relevant work, step five requires the Commissioner to determine whether the claimant's impairments preclude adjusting to any other available work.  20 C.F.R. § 404.1520(g); *see also Plummer*, 186 F.3d at 427-428.  At this final step, the burden is on the Commissioner to show the claimant is capable of performing other available work existing in significant national numbers and consistent with the claimant's medical impairments, age, education, past work experience and RFC before denying disability benefits.  *Plummer*, 186 F.3d at 427-428.  In making this determination, the ALJ must analyze the cumulative effect of all the claimant's impairments and often seek the assistance of a vocational expert.  *Id*.

### 1.    Weight Given to Treating Physicians

Plaintiff asserts the ALJ erred by failing to give the opinions of Drs. Falco and Stephens controlling weight.  (D.I. 10, 17.)  "A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight."  *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000).  Such reports will be given controlling weight where a treating source's opinion on the nature and severity of a claimant's impairment is well supported by medically acceptable clinical and laboratory

18

diagnostic techniques, and is not inconsistent with the other substantial evidence on record. *Fargnoli*, 247 F.3d at 43.

The ALJ must consider medical findings supporting the treating physician's opinion that the claimant is disabled. *Morales*, 225 F.3d at 317 (citing *Plummer*, 186 F.3d at 429). It is error, however, to apply controlling weight to an opinion merely because it comes from a treating source if it is not well-supported by the medical evidence, or inconsistent with other substantial evidence, medical or lay, in the record. SSR 96-2p. If the ALJ rejects the treating physician's assessment, he may not make "speculative inferences from medical reports," and may reject "a treating physician's opinion outright only on the basis of contradictory medical evidence." *Plummer*, 186 F.3d at 429. A statement by a treating source that a claimant is "disabled" is not a medical opinion: rather, it is an opinion on an issue reserved to the ALJ because it is a finding that is dispositive of the case. *See* 20 C.F.R. § 416.927 (e)(1). Only the ALJ can make a disability determination. Also, the ALJ may not give greater weight to the assessment of a physician who has not personally examined the claimant if the assessment conflicts with those by physicians who have personally examined the claimant. *Brownawell v. Comm'r of Soc. Sec.*, 554 F.3d 352, 357 (3d Cir. 2008).

In this instance, the ALJ did not give proper weight to the medical opinions and objective record evidence of Drs. Falco and Stephens. The ALJ gave diminished weight to their conclusions because the doctors suggested an inability to perform sedentary work activity on a sustained basis.[21] (D.I. 6 at 20.) Their opinions were

_____

[21] Both doctors actually stated plaintiff could not work at all. (*See, e.g., id.* at 340, 611, 723.)

19

based on their examinations of plaintiff and findings of an annular tear of the L4/5 disc, severe low back pain, post-traumatic lumbar strain, and degenerative lumbar disc disease. (*See, e.g., id.* at 339-40, 611-12, 722-23.) Both doctors examined plaintiff and did not base their findings only upon subjective history or complaints. (*See, e.g., id.* at 339-40, 611-12, 722-23.)

In determining the weight afforded to the assessments of Drs. Falco and Stephens, the ALJ noted certain normal findings in their examinations, including normal alertness, reflexes, and gait;[22] lack of atrophy; and full muscle strength and tone. (*Id.* at 14-20.) Such findings, however, do not preclude diagnoses of multiple lower back problems and attendant severe lower back pain. (*Id.* at 15-20.)

The ALJ noted plaintiff was able to engage in certain personal activities, but these activities were greatly restricted by pain, and could only be performed on a limited basis. (*Id.* at 17, 148-53.) The ALJ did not acknowledge these restrictions and limitations, and speculated the normal findings and personal activities somehow reduced the severity of plaintiff's lower back issues and attendant pain to allow limited sedentary work. (*See id.* at 17.) The findings of Drs. Falco and Stephens were not contradicted by the record as a whole. Since "speculative inferences from medical reports" are inappropriate, there is not substantial evidence for the ALJ to appreciably reduce the weight afforded to plaintiff's treating physicians' opinions. *Plummer*, 186 F.3d at 429.

---

[22] Dr. Stephens' August 2007 examination of plaintiff noted a slow plodding gait. (*Id.* at 722.)

20

The ALJ also gave significant weight to Dr. Stein's opinion that plaintiff was able to engage in light work. (*Id.* at 20.)  Dr. Stein never personally examined plaintiff, and his opinion predated Dr. Stephens' second examination which found, based on the notable increase in symptoms, plaintiff was incapable of working, findings which were consistent with those of Dr. Falco. (*Id.* at 600-606, 611-12, 721-23.)  Greater weight should not be afforded the assessment of a physician who has not personally examined a claimant if it conflicts with findings of treating physicians who have. *Brownawell*, 554 F.3d at 357.

## 2. Determination Plaintiff Could Perform Sedentary Work

Plaintiff asserts the ALJ erred by finding he could perform sedentary work. (D.I. 10, 17.)  Sedentary work is defined as requiring a total of no more than two hours of standing in an eight-hour workday. SSR 83-10, at *5.  Jobs involving more than two hours of standing in an eight-hour workday are classified as light instead of sedentary. (*See id.*, at *5, *6.)  Some individuals otherwise capable of performing sedentary work cannot perform such work because of a requirement to alternate between sitting and standing. SSR 83-12 (1983), at *4.  Unskilled jobs, in particular, often cannot be adjusted to accommodate a requirement to alternate between sitting and standing. (*Id.*)  When such a requirement exists, the testimony of a VE is needed to explain the limitation's effect on the jobs an individual could otherwise perform. (*Id.*)  The ALJ may not rely on the testimony of a VE if it conflicts with regulatory policies, including policies involving exertional levels. SSR 00-4P, at *3.

In the present case, the ALJ noted plaintiff was capable of performing sedentary work on an eight-hour-per-day, five-day-per-week basis, but would require constant alternating between sitting and standing every fifteen to twenty minutes. (D.I. 6 at 21.) This limitation would require plaintiff to stand for a total of four hours[23] during an eight-hour workday. Since sedentary jobs may only involve a total of two hours of standing during an eight-hour workday, this alternating sitting and standing restriction is inconsistent with sedentary work.

The VE, in responding to the ALJ's hypothetical of an individual who could perform sedentary work but who also required alternating between sitting and standing every fifteen to twenty minutes, stated plaintiff could perform several sedentary jobs. (*Id.* at 56-57.) When questioned by the ALJ whether these jobs would be compatible with plaintiff's sitting and standing requirements, the VE advised they were. (*Id.* at 57.) This testimony, however, conflicts with the regulatory policy involving the maximum amount of standing permitted for sedentary jobs. The ALJ, thus, erred in relying on the VE's testimony that plaintiff could perform some sedentary work. (*Id.* at 21-22.)

With due consideration given to the parties' arguments and submissions, and the applicable law, the court finds that the ALJ's disability determination was not properly supported by substantial evidence.

---

[23] Standing every other fifteen minutes means plaintiff would stand thirty minutes of each hour, and would necessitate in an eight hour work day a total of 240 minutes or four hours of standing. Standing every other twenty minutes would require plaintiff to stand for forty minutes during the first, third, fifth, and seventh hours for a total of 160 minutes, and for twenty minutes during the second, fourth, sixth, and eighth hours for a total of eighty minutes. Thus, in an eight hour workday, plaintiff would stand for a total of 240 minutes or four hours.

22

## V.    CONCLUSION

For the aforementioned reasons, the court concludes that the ALJ's denial of

DIB and SSI is not based on substantial evidence, and accordingly, will grant Bentzen's

motion for summary judgment and deny the Commissioner's motion for summary

judgment.

Dated June _12_, 2014

CHIEF, UNITED STATES DISTRICT JUDGE

23